STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-537

JOHN KITE, ET AL.

VERSUS

RAPIDES PARISH SHERIFF'S DEPARTMENT, ET AL.

CONSOLIDATED WITH

24-538

LEON BOYD, ET AL.

VERSUS

RAPIDES PARISH SHERIFF'S DEPARTMENT, ET AL.

**********
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, DOCKET NOS. 252,993 AND 253,035
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

**********

JONATHAN W. PERRY
JUDGE

**********

Court composed of Candyce G. Perret, Jonathan W. Perry, and Guy E. Bradberry, Judges.

AFFIRMED.

Jared Dunahoe
DUNAHOE LAW FIRM
402 Second Street
Natchitoches, Louisiana 71457
(318) 352-1999
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    Ja'La Wanya Boyd, Ja'Marsha Deon Boyd, and Tauriez Kite

H. Bradford Calvit
Eli J. Meaux
PROVOSTY, SADLER, deLAUNAY, APC
4615 Parliament Dr., Suite 200
Alexandria, Louisiana 71315-3530
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    William Earl Hilton and The Princeton Excess and Surplus Lines Insurance
    Company

Richard A. Rozanski
RICHARD A. ROZANSKI, APLC
2312 South MacArthur Drive
Alexandria, Louisiana 71301
(318) 445-5600
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    The City of Alexandria, Earl Williams, Sr. and Henry Jacobs

Misty Shannon Antoon
LAW OFFICE OF MISTY SHANNON ANTOON, LLC
2312 South MacArthur Drive
Alexandria, Louisiana 71301
(318) 792-3514
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    The City of Alexandria, Earl Williams, Sr., and Henry Jacobs

**PERRY, Judge.**

In this wrongful death and survival action involving a victim killed by an escaped prisoner, Plaintiffs appeal the dismissal of their action against a former sheriff and his insurer, on a motion for summary judgment. We affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

McKennedy Armstead ("Armstead") was a Department of Correction ("DOC") inmate incarcerated in the Rapides Parish Detention Center III, serving a two-and-one-half-year sentence for Possession of a Controlled Dangerous Substance, Schedule II. On June 2, 2014, Armstead was acting as a trusty performing labor for the City of Alexandria ("the City") at the City's Utility Department ("the Utility Department"). On that day, Henry Jacobs ("Jacobs") and Earl Williams, Sr. ("Williams"), two Utility Department employees who had been commissioned by the Rapides Parish Sheriff ("Sheriff"), were supervising Armstead.

While working for the Utility Department, Armstead accessed the keys to a City truck and escaped. He drove the City vehicle near his mother's house in Alexandria, walked to his mother's home, retrieved a gun, and convinced his cousin, Antonio Calhoun ("Calhoun"), to drive him to the home of his girlfriend, Johnnie Kite ("Ms. Kite"), in Grant Parish. Calhoun drove Armstead to Ms. Kite's house and remained in the vehicle while Armstead entered Ms. Kite's house. Once inside, Ms. Kite's three children exited the house and got into Calhoun's vehicle. After Calhoun drove away, Armstead shot and killed Ms. Kite and then committed suicide.

On May 28, 2015, John Kite ("Mr. Kite"), father of Ms. Kite, as Administrator of the Succession of Ms. Kite and on behalf of her minor children, Ja'La Wanya

Boyd ("Ja'La"), Ja'Marsha Deon Boyd ("Ja'Marsha"), and Tauriez Kite ("Tauriez"), filed suit against the Rapides Parish Sheriff's Department ("Sheriff's Department"), former Sheriff William Earl Hilton ("Sheriff Hilton"), the Utility Department, and Mayor Jacques Roy, alleging the wrongful death of Ms. Kite. Mr. Kite alleged that Armstead was incarcerated in a work release program sponsored and supervised by the Sheriff's Department and additional supervision was provided by commissioned deputies employed by the Utility Department and the City.

On June 3, 2015, another Petition for Damages was filed by Leon Boyd ("Boyd") also on behalf of the minor children of Ms. Kite, Ja'La and Ja'Marsha, while Aline Craft ("Ms. Craft") filed suit on behalf of the minor child, Tauriez. Boyd alleged that he was the father, caretaker, and natural tutor of Ja'La and Ja'Marsha, while Ms. Craft alleged that she was the aunt of Tauriez and had care, custody and control of him. The petition filed by Boyd and Ms. Craft mirrored the claims raised in Mr. Kite's petition.

After the two lawsuits were consolidated, an amended and supplemental petition was filed by Mr. Kite. It named and substituted Boyd as the natural tutor of the minor children, Ja'La and Ja'Marsha. It also named and substituted Tauriez Shaw as the natural tutor of the minor child, Tauriez. A second amending and supplemental petition was later filed, adding the following as Defendants: Jacobs, Williams, and Princeton Excess and Surplus Lines Insurance Company ("Princeton"), the alleged insurer of the Sheriff, Jacobs, and Williams. Later, a third amending and supplemental petition was filed, stating that Ja'La, Ja'Marsha, and Tauriez (collectively "Plaintiffs") were no longer minors and sought to be substituted as proper party plaintiffs.

In answer to the various petitions, the Sheriff denied fault, alleged the fault of Armstead and the City, invoked the protections of La.R.S. 9:2798.1 and La.R.S. 15:708, and further contended that Armstead was not in the process of escaping when Ms. Kite was killed. In their answers to the various petitions, the City, Williams, and Jacobs alleged that Armstead was not in the process of escaping when the shooting of Ms. Kite occurred, that Armstead was motivated by purely personal reasons, and that there was no independent duty to Ms. Kite, a Grant Parish resident, which encompassed the risk of harm.

After discovery was completed, the Sheriff and Princeton (collectively "Defendants") filed a Motion for Summary Judgment, asserting four arguments: first, the Sheriff complied with the legal requirements outlined in La.R.S. 15:708 to allow a trusty to work for the City; second, whether the Sheriff or a deputy should have put in place more or different policies or should not have allowed Armstead to be selected for the City work program were discretionary acts under the provisions of La.R.S. 9:2798.1; third, there is no proof or evidence that the Sheriff committed criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct; and fourth, Plaintiffs have no proof that the unfortunate death of Ms. Kite occurred while Armstead was in the process of escaping. Therefore, the Sheriff and Princeton asked that they be granted summary judgment.

In a separate filing, the City, Jacobs, Williams, the Sheriff, and Princeton filed a Joint Motion for Summary Judgment, asserting four arguments: first, Armstead was no longer in the process of escaping when he was at Ms. Kite's home in Grant Parish when the offense occurred; second, Armstead was acting in furtherance of his own pursuits when he committed the offense at Ms. Kite's home; third, Ms. Kite was not within the scope of duty of Defendants; and fourth, Defendants were not the

3

cause in fact of the offense. Therefore, they sought to have the lawsuits against them dismissed with prejudice.

Plaintiffs opposed both Motions for Summary Judgment. They made three basic arguments contending that the Sheriff was independently and grossly negligent: (1) in allowing Armstead to participate in the trusty program considering his extensive and violent criminal history; (2) in failing to properly train Jacobs and Williams; and (3) in failing to follow his policies and procedures and have the City execute a contract to use trusties. They further argued that the Sheriff was vicariously liable for the gross negligence of Jacobs and Williams. Additionally, they argued that the Sheriff and the City were not entitled to the limitation of liability found in La.R.S. 15:708(H) because Armstead was not a prisoner sentenced to a parish prison or a prisoner in a parish prison awaiting transfer to a state correctional facility.

In support of Plaintiffs' contentions, they further relied upon the affidavit of W. Lloyd Grafton ("Grafton"), who they presented as an expert in the field of law enforcement training, actions, policies and procedures; his accompanying deposition; as well as other depositions in the record. Defendants objected to Grafton's affidavit and depositional testimony on various grounds, including, but not limited to, the filing of a challenge under La.Code Civ.P. art. 1425(F) to whether Grafton qualified as an expert witness. Before ruling on the motions for summary judgment, the trial court heard argument on whether Grafton lacked the expertise to offer expert opinions and whether his opinions touched on the ultimate issue for the factfinder.

After considering the record filings and the oral arguments of the parties, the trial court granted the Motion for Summary Judgment filed by the Sheriff and his

insurer, Princeton, finding no genuine issue of material fact concerning his lack of liability based on the gross negligence standard enunciated in La. R.S. 15:708. It also granted the Sheriff's Motion in Limine, concluding that Grafton's opinions were inadmissible. On May 28, 2024, the trial court rendered judgment in favor of the Sheriff and Princeton, as follows:

> After considering the Motions, Memoranda, Exhibits and applicable law and hearing argument, and for the reasons for Judgment given in open court, the Motion for Summary Judgment filed on behalf of Defendants, WILLIAM EARL HILTON, IN HIS FORMER CAPACITY AS SHERIFF OF RAPIDES PARISH and THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, was granted. However, the claim that THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY provided coverage for Earl L. Williams, Sr., and Henry Jacobs was not before the Court; accordingly, the claims made against THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY for coverage for the claims made against Earl L. Williams, Sr., and Henry Jacobs are not dismissed and remain.

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Motion for Summary on the Motion for Summary Judgment filed by Defendants, WILLIAM EARL HILTON, IN HIS FORMER CAPACITY AS SHERIFF OF RAPIDES PARISH and THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, is hereby granted, dismissing all claims made against Defendants, WILLIAM EARL HILTON, IN HIS FORMER CAPACITY AS SHERIFF OF RAPIDES PARISH and THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, but only as the insurer for the claims against Defendant, WILLIAM EARL HILTON, IN HIS FORMER CAPACITY AS SHERIFF OF RAPIDES PARISH, with full prejudice, with Plaintiffs to pay the costs of the defendants, WILLIAM EARL HILTON, IN HIS FORMER CAPACITY AS SHERIFF OF RAPIDES PARISH and THE PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Motion in Limine is hereby granted and that the Affidavit of [W.] Lloyd Grafton be stricken and is not considered in opposition to the Motion for Summary Judgment.

Plaintiffs appealed the judgment of May 28, 2024.

At the same time that the trial court granted the Defendants' Motion for Summary Judgment, the trial court denied the City's Motion for Summary Judgment. In an unpublished writ ruling, this court denied the City's application for a supervisory writ. On February 28, 2025, the supreme court held that Armstead's escape was complete before he entered Ms. Kite's house and murdered her. Accordingly, in a per curiam opinion, it granted the City's writ application, reversed the trial court judgment, and dismissed the Plaintiffs' claims against the City, the Sheriff, Williams, and Jacobs. *Kite v. Rapides Parish Sheriff's Dep't*, 24-1351 (La. 2/28/25), 401So.3d 1262. Based upon that decision, we affirmed the trial court's judgment as it related to the Sheriff and Princeton. *Kite v. Rapides Parish Sheriff's Dep't,* 24-537, 24-538 (La.App. 4/9/25), 408 So.3d 1237.

The Plaintiffs sought a rehearing of the supreme court's decision dated February 28, 2025. On June 3, 2025, the supreme court granted the Plaintiffs' application for rehearing and vacated its prior per curiam opinion in *Kite*, 401So.3d 1262. *See Kite v. Rapides Par. Sheriff's Dep't*, 24-1351 (La. 6/3/25), 410 So.3d 768.

On the strength of the supreme court's latest ruling, the Plaintiffs applied for a writ of certiorari from our April 9, 2025 decision. On November 5, 2025, the supreme court granted the Plaintiffs' writ of certiorari and remanded the case to us for reconsideration in light of its June 3, 2025 ruling on rehearing. *Kite v. Rapides P. Sheriff's Dep't*, 25-589 (La. 11/5/25), 421 So.3d 967. Accordingly, we will address the other assignments of error that we did not discuss in our earlier opinion.

## ASSIGNMENTS OF ERROR

Plaintiffs suggest the Trial Court erred when it granted: (1) the Defendants' Motion for Summary Judgment, and (2) Defendants' Motion in Limine when it struck the affidavit of Plaintiffs' expert, Grafton.

## APPELLANTS' ARGUMENT

Plaintiffs argue that there is a genuine issue of material fact about whether the Sheriff breached his duty to manage the affairs of the prison so as not to create an unreasonable risk of harm to the public. Accordingly, they urge us to reverse the trial court's grant of summary judgment.

They contend that the Sheriff was independently grossly negligent when he failed to properly train the deputies assigned to supervise Armstead while he worked as a trusty for the City. According to them, it was reckless for the Sheriff to permit a dangerous and convicted felon/inmate to work as a trusty without requiring the supervisors of the inmate to have had basic training or experience in law enforcement.

Additionally, they argue that there is a genuine issue of material fact about whether the Sheriff is vicariously liable for the gross negligence of Williams and Jacobs, both commissioned deputies, in failing to properly supervise Armstead. The Plaintiffs point out that the sole task of Williams and Jacobs was to supervise trustees such as Armstead. Despite this, they contend that these deputies allowed Armstead to make telephone calls and gain access to a vehicle. They argue that had these deputies followed the rules for supervising trustees, Armstead would never have escaped. More generally, they suggest that it was grossly negligent for the Sheriff to allow Armstead to participate in the trusty program considering his extensive and violent criminal history.

In this regard, too, the Plaintiffs argue that the trial court erred when it granted Defendants' Motion in Limine, striking Grafton's affidavit that purportedly addressed the issue of gross negligence. Supporting their argument, the Plaintiffs argue that: (1) Grafton's affidavit complied with the requirements of La.Code Civ.P. art. 967 as it set forth his opinions and described the factual basis for those opinions; and (2) Grafton's opinion that the Sheriff breached its duty was based on the following facts: (a) the Sheriff placed Armstead into the custody of two individuals who had no training or experience in law enforcement; and (b) Armstead was permitted to gain access to a vehicle and to make a telephone call while working as a trusty.

Additionally, the Plaintiffs contend that Grafton showed that he was competent to testify because: (a) he had a doctorate and master's degree in criminal justice; (b) he served for decades as a professor of criminal justice and taught classes specifically on corrections; (c) from 1972 to 1990, the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives employed him as a special agent who, in part, trained police officers; (d) he was an instructor at the Federal Law Enforcement Center; and (e) the Federal Bureau of Prisons employed him as an instructor of corrections officers.

In sum, the Plaintiffs contend that it was the Sheriff's gross negligence in failing to follow his policies and procedures that allowed Armstead to escape.[1]

---

[1] The Plaintiffs further argue that Ms. Kite's death occurred during or as an integral part of the process of Armstead escaping. In that respect, they contend that, as shown by the record, Ms. Kite was killed less than two hours after Armstead fled and her death occurred within thirty miles of the Utility Department. Because of our resolution of this case on the Plaintiffs' failure to establish another essential element of their case, as outlined more fully below, and the supreme court's ruling dated June 23, 2025, we do not reach the question of whether Armstead killed Ms. Kite while he was in the process of escaping.

## APPELLEES' POSITION

The Defendants assert that the trial court did not err when it granted their Motion for Summary Judgment. As applied by the trial court, the correct standard applicable to the Sheriff is the gross negligence standard enunciated in La.R.S. 15:708(H). Although Plaintiffs argue that the immunity recognized in La.R.S. 15:708(H) is inapplicable because of Armstead's alleged status, the Defendants contend that such an argument is not supported by Louisiana Supreme Court jurisprudence that has applied the gross negligence standard in similar cases. Moreover, whether under either gross negligence or typical negligence standards, they argue that the Sheriff is not liable as his actions did not violate any duty owed to Ms. Kite or anyone else. In this regard, they contend that the trial court did not err when it granted the Defendants' Motion for Summary Judgment.

Furthermore, in reaching that determination, the Defendants urge us to find that the trial court did not err when it granted Defendants' motion to exclude Grafton's opinions stated in his affidavit and deposition. Initially, they contend that Grafton: (a) lacked any current training, education or experience in corrections, including a lack of knowledge regarding the process of selecting trusties; (b) his corrections experience occurred in the 1960s; and (c) his knowledge was general, not expertise. Lastly, the Defendants argue that Grafton's opinions were impermissible because they touched upon ultimate issues of liability and were beyond his area of expertise. Therefore, under applicable evidentiary law, the Defendants contend that the trial court correctly found that Grafton's opinions stated in his affidavit and deposition were properly excluded or struck.

9

**GRAFTON'S AFFIDAVIT**

*The Procedural History*

On November 13, 2023, the Defendants filed their initial Motion for Summary Judgment. Subsequently, on February 21, 2024, the Plaintiffs filed their Opposition to Defendants' Motions and Supplemental Motions for Summary Judgment. Among the items attached and relied upon in support of their argument was Grafton's affidavit.

Thereafter, on March 6, 2024, the Defendants filed their Reply to the Plaintiffs' Opposition to Motion for Summary Judgment, seeking to exclude Grafton's opinions and affidavit from consideration in opposition to the Motions for Summary Judgment, as well as his future testimony at trial; in support of their argument in the reply memorandum, the Defendants attached Grafton's deposition taken on February 29, 2024. On March 20, 2024, the Defendants, out of an abundance of caution, further filed a Motion In Limine (*Daubert* Motion), seeking to exclude Grafton's opinions and affidavit from consideration in opposition to the Motions for Summary Judgment, as well as any testimony by him at trial.

In response, the Plaintiffs filed an objection to the attachment of Grafton's deposition to Defendants' reply to the plaintiffs' opposition to the Motion for Summary Judgment and Defendants' Motion in Limine. The Plaintiffs argued that by virtue of La.Code Civ.P. art. 966(D)(2), the Defendants were prohibited from offering any exhibit, specifically Grafton's deposition, with their reply memorandum. Furthermore, the Plaintiffs asserted that Defendants' Motion In Limine was untimely.

Assuming for purposes of argument that the Defendants improperly included Grafton's deposition in their reply memorandum, we find, as explained below, that

there is no merit to the Plaintiffs' argument. It is well-accepted that "[w]e look through a pleading's caption, style, and form to determine its substance and to do substantial justice to the parties." *Metro Riverboat Associates, Inc. v. La. Gaming Control Bd.*, 01-185, p. 6 (La. 10/16/01), 797 So.2d 656, 660. Even though the Defendants later filed an independent *Daubert* motion, we consider the Defendants' opposition in their reply to constitute a motion under La.Code Civ.P. art. 1425(F) and recognized in La.Code Civ.P. art. 966(D)(3).

Louisiana Code of Civil Procedure Article 966(D)(3) states:

> If a timely objection is made to an expert's qualifications or methodologies in support of or in opposition to a motion for summary judgment, any motion in accordance with Article 1425(F) to determine whether the expert is qualified or the expert's methodologies are reliable shall be filed, heard, and decided prior to the hearing on the motion for summary judgment.

From the outset, the Plaintiffs argue that the Defendants' motion is untimely. We disagree. A motion under La.Code Civ.P. art. 1425(F)(1) "shall be filed not later than sixty days prior to trial . . . [.]" In the present case, no trial was currently scheduled when the motion was heard. Whether we consider the filing date of Defendants' reply memorandum or their later filed Motion in Limine, we find their opposition to Grafton's affidavit and trial testimony was timely raised.

*The Merits of the Motion in Limine*

Louisiana Code of Civil Procedure Article 1425(F)(3) states that "[i]f the ruling is made at the conclusion of the hearing, the court shall recite orally its findings of fact, conclusions of law, and reasons for judgment." Additionally, La.Code Civ.P. art. 967 further states: "The supporting and opposing affidavits of experts may set forth such experts' opinions on the facts as would be admissible in

evidence under Louisiana Code of Evidence Article 702, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

"[T]he trial court's discretion in controlling the admission of expert testimony is well established in Louisiana jurisprudence." *S. Casing of La.,, Inc. v. Houma Avionics, Inc.*, 00-1930, 00-1931, p. 24 (La.App. 1 Cir. 9/28/01), 809 So.2d 1040, 1055. The trial court has great discretion in determining the sufficiency of the qualifications for a witness to testify as an expert. *State v. Mays*, 612 So.2d 1040 (La.App. 2 Cir.), *writ denied*, 619 So.2d 576 (La.1993).

In the present case, the record contains Grafton's deposition. In his testimony, Grafton stated that he: (1) was not familiar with Louisiana law concerning what prisoner could serve as a trusty; (2) was not familiar with any POST provisions relative to that issue; (3) was not acquainted with the provisions of La.R.S. 15:708; and (4) although he had actual corrections training from California in the 1960s, that training would not have been relevant to a Louisiana jail setting in 2017. Against that background, the trial court concluded that Grafton's training and life experience were too far removed and too generalized to provide expertise to the trier of fact.[2]

We find that the trial court's conclusions in that regard are fully supported by the decision in *Carter as Next Friend for Carter v. City of Shreveport*, (W.D. La. 2023) (2023 WL 2775662). In that opinion, the plaintiffs offered Grafton's opinions about medical treatment of a wheelchair-bound inmate in a correctional facility. There, the court was asked not to qualify Grafton to testify concerning policies relating to such medical treatment.

---

[2] At this time, only the City of Alexandria has sought a trial by jury. Therefore, even if a jury would have determined the liability of the City, the trial judge, as the trier of fact, would have been tasked with separately determining the Sheriff's liability.

It held:

> Plaintiff asserts that, even if Grafton cannot testify as to the proper treatment for wheelchair-bound individuals specifically, Grafton can opine to general jail policies and procedures due to his experience as a law enforcement officer.  See Record Document 59 at 4.  However, merely being able to read jail procedures and form a general opinion about them does not make one an expert on those procedures.  See In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1233 (5th Cir. 1986) ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.").  And as Defendants point out, "Grafton has not worked as a correctional officer, has never been trained on the policies and procedures of a municipal correctional facility (only 'reviewed' them), and has never worked as a consultant with a correctional facility."  See Record Document 51-1 at 8.  Thus, Grafton lacks the training and specialized knowledge pertaining to jail policies that would qualify him as an expert in his proposed field of tender.

*Carter* at 3.

Beyond that, the trial court was faced with Grafton's varied pronouncements about ultimate issues of the case.  In that regard, Plaintiffs' counsel conceded that Grafton's opinions on legal cause and gross negligence were not admissible.

"When an expert opinion constitutes the actual legal conclusion, it goes beyond what is helpful to the [fact finder] and is not admissible."  *Lafayette Steel Erector, Inc. v. G. Kendrick, LLC*, 22-0892, p. 14 (La.App. 1 Cir. 8/29/23), 375 So.3d 464, 475, *writ denied*, 23-01316 (La. 12/19/23), 375 So.3d 414 (citing *Islam v. Walmart, Inc.*, 21-629 (La.App. 5 Cir. 6/8/22), 343 So.3d 883, *writ denied*, 22-01053 (La. 10/12/22), 348 So.3d 70; and *Burk v. Ill. Cent. Gulf R.R. Co.*, 529 So.2d 515, (La.App. 1 Cir.), *writ denied*, 532 So.2d 179 (La.1988)).

For these reasons, we find the trial court did not abuse its discretion when it excluded Grafton's affidavit and his deposition testimony.  Accordingly, we find no merit to the Plaintiffs' assertion that the trial court erred in excluding Grafton's

affidavit in support of their motion for summary judgment as well as his future testimony at trial.

## SUMMARY JUDGMENT

Appellate courts review motions for summary judgment using a de novo standard. *Planchard v. New Hotel Monteleone, LLC*, 21-347 (La. 12/10/21), 332 So.3d 623. An appellate court assesses whether summary judgment is appropriate utilizing the same standard as the trial court to determine "whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Id*. at 625. `

Initially, the burden of producing evidence at the motion hearing is on the mover, "who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case." *Schultz v. Guoth*, 10-343, p. 6 (La. 1/19/11), 57 So.3d 1002, 1006. Procedurally, therefore, the court's first task is to determine whether the moving party's motion, memorandum, affidavits, and supporting documents are sufficient to resolve all material factual issues. *Smith v. Our Lady of the Lake Hosp., Inc*., 93-2512 (La. 7/5/94), 639 So.2d 730. "To satisfy this burden, the mover must meet a strict standard of showing that it is quite clear as to what is the truth and that there has been excluded any real doubt as to the existence of a genuine issue of material fact." *Indus. Sand & Abrasives, Inc. v. Louisville & Nashville R.R. Co*., 427 So.2d 1152, 1154 (La.1983).

In making this determination, the court must closely scrutinize the mover's supporting documents, while treating those submitted by the adverse party indulgently. *Smith*, 639 So.2d 730. Moreover, because the moving party bears the burden of proving the lack of a material issue of fact, we must view all inferences

14

drawn from the underlying facts in a light most favorable to the adverse party. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991).

If we determine that the moving party has met this onerous burden, the burden then shifts to "the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." La.Code Civ.P. art. 966(D)(1). "At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial." *Babin v. Winn-Dixie La., Inc.*, 00-78, p. 4 (La. 6/30/00), 764 So.2d 37, 39.

As our courts have long held, "summary judgment may be granted when reasonable minds must inevitably conclude that the mover is entitled to judgment on the facts before the court." *Smith*, 639 So.2d at 752. However, "[o]nce the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Babin*, 764 So.2d at 40.

We further note that the summary judgment procedure is favored and, by law, shall be construed to accomplish the ends for which it was designed: "to secure the just, speedy, and inexpensive determination of every action[.]" La.Code Civ.P. art. 966(A)(2).

With these principles in mind, we now turn to Defendants' Motion for Summary Judgment.

*Analysis*

In *Roberts v. Benoit*, 605 So.2d 1032, 1051 (footnotes omitted), the supreme court stated:

15

To prevail on a negligence claim under La.Civ.Code arts. 2315 and 2316, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).

In the present case, the applicability of La.R.S. 15:708, particularly the limitation of the Sheriff's liability, and the Sheriff's entitlement to summary judgment thereunder is at issue here. In that regard, La.R.S. 15:708 provides, in pertinent part, as follows:

A. (1) Whenever a prisoner sentenced to a parish prison of any parish of the state, by any court of competent jurisdiction, or a prisoner in a parish prison awaiting transfer to a state correctional facility shall be willing of his own free will to perform manual labor upon any of the public roads, levees, streets, or public buildings, works, or improvements inside or outside of the prison, or in or upon the buildings, other improvements, or property of any organization which has qualified for tax-exempt status under 26 USC 501(c)(3), 501(c)(19), or 501(c)(23), the sheriff may set the prisoner to work.

. . . .

H. A prisoner participating in any of the inmate labor programs authorized by this Section shall have no cause of action for damages against the sheriff or any parish or municipal authority conducting the program or supervising his participation therein, nor against any deputy, employee, or agent of such sheriff or parish or municipal authority, for any injury or loss suffered by him during or arising out of his participation in the program, unless the injury or loss was caused by the intentional or grossly negligent act or omission of the sheriff or the parish or municipal authority or the deputy, employee, or agent of the sheriff or parish or municipal authority. Nor shall liability be imposed on the sheriff or the parish or municipal authority or the deputies, employees, or agents of the sheriff or the parish or municipal authority for any injury caused by a prisoner participating in any of the inmate labor programs authorized by this Section unless the gross negligence or intentional act of the sheriff or any parish or municipal authority or the deputy, employee, or agent of the sheriff or the parish or municipal authority was a substantial factor in causing the injury. No provision hereof shall negate the requirement to provide a prisoner with necessary medical treatment as statutorily required.

The Plaintiffs argue that La.R.S. 15:708 is inapplicable because Armstead was not sentenced to the parish prison, and he was not awaiting transfer to a state correctional facility. Additionally, the Plaintiffs contend that beyond that, Armstead was violent and was ineligible for the trusty program.

Lieutenant Jay Slayter ("Lieutenant Slayter") was a commissioned deputy under the former Sheriff Hilton and for succeeding sheriffs of Rapides Parish. At the time of this litigation, he was Warden of Rapides Parish Detention Center II. Commencing on July 1, 2012, he was assigned to Corrections Investigations. On June 2, 2014, Lieutenant Slayter was assigned to investigate Armstead's escape from the care, custody, and control of the City. In his deposition and affidavit, he confirmed that Armstead was an inmate serving time for the Louisiana Department of Corrections ("DOC") at the Rapides Parish Detention Center III. He also stated that Armstead was first approved to be a trusty on June 3, 2013, and that he was qualified to leave the facility and provide labor to the City. After reviewing numerous computer entries, he confirmed that Armstead was serving time for a narcotics conviction, that he was not considered dangerous, that he was not considered an escape risk, and that at the time of his escape, he only had eighteen days left to serve on his conviction before his release date of June 20, 2014.

After considering these facts de novo and that the Plaintiffs have not traversed them, we find no merit to the Plaintiffs' initial contention that La.R.S. 15:708 was inapplicable to this litigation. Thus, we find that liability may only be imposed on the Sheriff if the Plaintiffs can show that the gross negligence or intentional act "of the sheriff or any parish or municipal authority or the deputy, employee, or agent of the sheriff or the parish or municipal authority was a substantial factor in causing the injury" to Ms. Kite. La.R.S. 15:708(H). Additionally, after conducting a de novo

review of the facts presented in support of the Defendants' Motion for Summary Judgment, we find no merit to the Plaintiffs' contention that Armstead was ineligible for the trusty program.

*Failure to Train*

We now address the Plaintiffs' contention that the Sheriff was grossly negligent when he failed to train the two City employees who supervised Armstead as he worked at the Utility Department.

In the present case, Lieutenant Slayter stated that he conducted the corrections investigation of Armstead's escape from the Utility Department. As the former Warden of Rapides Parish Detention Center III and later as Warden of Rapides Detention Center II, he said that he had personal knowledge of the trusty program the City implemented to have Armstead work in the Utility Department, and he was well familiar with the Trusty/Inmate Work Contract (the "Work Contract") signed by the individuals[3] who supervised Armstead while he worked at the Utility Department.

The Work Contract, in pertinent part, specified the following rules and regulations:

> 1. A commissioned employee shall be assigned and shall be responsible at all times for directly supervising the work performed by inmates. This commissioned employee shall be at the expense of the agency requesting the inmate(s). This employee may be required to produce his/her commission card before he/she can pick up their inmate(s).
>
> 2. Inmate(s) shall never be left alone unsupervised.
>
> 3. Inmate(s) shall not be allowed to have visitors or telephone calls while assigned to your agency. (Including use of computers)

---

[3] Even though the record contains signed contracts by Jacob and another City employee/trusty supervisor, Anthony Carmouche, we note that the contract attached to Williams's deposition is unsigned. Nonetheless, the signed contracts inform us about what expectations the Sheriff had of the City and its commissioned inmate supervisors.

. . . .

7. Inmate(s) shall not be allowed to operate any type of motor vehicle, farm or construction machinery at any time. (Ex.: Car, truck, van, tractor, backhoe, etc.)

. . . .

9. Instances of any inmate who refuses to work, has a bad attitude, acts inappropriately, leaves his/her assigned duty area without authorization, becomes ill or is injured or escapes from custody shall be reported immediately to the Rapides Parish Sheriff's Office.

. . . .

15. If a commissioned employee of the assigned agency is either terminated or resigns his/her position their commission card will be returned immediately to the Sheriff's Office before another employee will be commissioned.

16. It is responsibility of the agency to make all employees supervising inmate(s) aware of these rules and regulations.

Jacobs and Williams, long-time maintenance workers at the Utility Department, having worked respectively, twenty-three and nineteen years, became commissioned deputies with the Sheriff's Department because they sometimes transported inmates from the detention center to work at the Utility Department and supervised them while they worked at the Utility Department. Although they were given an identity card and a badge, they did not carry a firearm and did not receive pay from the Sheriff; as part of the protocol, these supervisors were required to present these when they picked up inmates from the detention center. Neither the City nor the Sheriff's Department trained them on how to supervise inmates.

When the inmates worked in the Utility Department, they cleaned the break room, the bathrooms, and dumped the trash under the supervision of either Jacobs or Williams or another commissioned deputy employed by the City. While the commissioned deputies supervised the trusty, they would always keep the trusty

within their line of sight, as required by the Work Contract, except when the trusty went to the bathroom.

Both Jacobs and Williams knew Armstead. Jacobs said he never had any problems with Armstead. He described him as happy and a hard worker who did not cause problems, and who just did his work; he also said that he had never heard that Armstead had any problems with any other City employee at any time. Williams commented that Armstead was a good person, hard-working, and respectful; he also recalled that Armstead told him that he was eighteen days away from being released from prison.

Jacobs described the Light Department, a large building within the Utility Department, as having a fenced yard. Entry to the complex was through a driveway which has a gate that is operated by a remote control kept in the truck. There is no guard shack at the gate. All City vehicles are parked inside the gate with public parking outside the gate. The Light Department is wide open inside, except for four offices. Both Jacobs and Williams explained that the keys to the City vehicles were kept in an office in the Light Department on a board that is labeled with numbers corresponding to the vehicles that the key operates; Williams did not know if the vehicle keys were locked or not.

On the day of Armstead's escape, Jacobs said that he never saw Armstead and that Williams supervised Armstead in the Light Department. While under Williams's supervision, Armstead asked for cleaning materials. Even though these materials were kept in a storage room, he stated that he could see in to the warehouse where Armstead was working. In response to that request, Williams walked to another part of the Light Department to get the supplies and gave them to Armstead.

After handing Armstead the cleaning supplies, Armstead told Williams that he was going to clean a fan as Jacobs instructed. Williams stated that he returned to the storage room for more cleaning supplies; during that time, there was a period of about two or three minutes when his back was turned, and Armstead was not in his line of sight. While Williams was retrieving the cleaning supplies, another inmate shouted that Armstead was gone. Before that time, no trusty had ever escaped from the Light Department.

After being told that Armstead was gone, Williams notified Jacobs. Upon receiving that information, Jacobs called the detention center and told the Sheriff's Department what happened. In light of these facts, we turn our attention to the jurisprudence best addressing the Plaintiffs' contentions.

Relying on *Roberts*, 605 So.2d at 1056, the Plaintiffs argue that the purpose of the Sherrif's duty to train his deputies "is to insure that deputies perform their law enforcement duties competently." Although we may agree with this holding in *Roberts*, we find it inapposite to the facts of the present case that involve the use of specially commissioned deputies whose only duty was to supervise a trusty who worked offsite.

In that regard, we find that *Skinner v. State*, 14-193 (La.App. 3 Cir. 10/1/14), 149 So.3d 193, better informs our decision in the present matter. There, we stated:

> Neither the Sheriff nor his employees were . . . on site and did not supervise the daily activities of inmates at the worksite. The Sheriff did not assign the manual labor tasks. Finally, the remaining defendants allege the Sheriff did not properly train the RRWC employees who had a special limited commission from the RPSO for the purpose of supervising the inmates. We find the contract is clear about the duties of the RRWC employees to supervise the inmates under their charge at all times, and any further training would not have prevented this particular accident.

We further note that imposing any of these duties on the Sheriff in this case would have a detrimental effect on the ability of any sheriff to allow inmates to participate in work programs outside the jail for other public entities. The cost of expanded training and inspections of facilities would be prohibitive.

*Id.* at 347.

As stated in *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, 93-3110, 93-3112, pp. 5–6 (La. 7/5/94), 639 So.2d 216, 219–20 (internal citations omitted):

> Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." "There is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning." Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.

The facts show that in the Work Contract the Sheriff specified the supervision duties that the specially commissioned deputies were to follow, namely, that the inmate "shall never be left alone unsupervised." This contractual charge is self-explanatory, and we find that no further training of the inmate supervisors would have prevented Armstead's escape. After carefully considering the facts presented in support of the Defendants' Motion for Summary Judgment and cognizant of the well-established definition of gross negligence, we find no merit to the Plaintiffs' contention that the Sheriff was grossly negligent in this regard.

*Vicarious Liability*

Next, we turn to the Plaintiffs' contention that the Sheriff was vicariously liable for the actions/inactions of the two commissioned deputies in the City's

employ. Louisiana Civil Code Article 2320, the source for vicarious liability, provides, in pertinent part, that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

> The single most important factor to consider in deciding whether the employer-employee relationship exists, for purposes of La. C.C. art. 2320, is the right of the employer to control the work of the employee. *Roberts v. State, Through the Louisiana Health and Human Resources Administration*, 404 So.2d 1221, 1225 (La. 1981) (*citing Hickman v. Southern Pacific Transport Company*, 262 La. 102, 262 So.2d 385 (1972), and *Blanchard v. Ogima*, 253 La. 34, 215 So.2d 902 (1968)). In *Blanchard*, this court stated: "It is the right of control of the time and physical activities in the other party and the existence of a close relationship between the parties which determine that one is a servant." *Id.*, 253 La. at 44, 215 So.2d at 905. This court further stated: "'Servant' must be interpreted as that particular kind of agent who has a very close economic relation to, and is subject to very close control by, the principal. A servant is one who offers his personal services for a price. He is an integral part of his employer's business and must submit to the control of his physical conduct as well as of his time." *Id.*, 253 La. at 47, 215 So.2d at 906. The four primary evidentiary factors considered in deciding whether such an employer-employee relationship exists relate to whether the alleged employer has the right or duty, relative to the employee, of: (1) selection and engagement; (2) payment of wages; (3) power of dismissal; and (4) power of control. *Hillman v. Comm-Care, Inc.*, 01-1140, p. 8 (La. 1/15/02), 805 So.2d 1157, 1162. However, no one factor is controlling; rather, the totality of the circumstances must be considered, and the burden of proof is on the party seeking to establish an employer-employee relationship. *Hillman*, 01-1140 at pp. 8-9, 805 So.2d at 1163.

*Bolden v. Tisdale*, 21-224, p. 13 (La. 1/28/22), 347 So.3d 697, 708.

Reviewing those factors and the facts presented in support of the Defendants' Motion for Summary Judgment, we make the following observations: (1) Williams and Jacobs were employed by the City and neither of them received day-to-day instructions from the Sheriff; (2) although the Work Contract tasked them not to leave the inmate unsupervised, that supervisory responsibility fell on the City and its staff; (3) the Sheriff had no authority to direct the inmate's labor; (4) the Sheriff

had no authority to fire or discipline the City's supervisory staff; (5) the Sheriff did not control how the supervisory staff performed their supervisory duties; and (6) the City was the sole beneficiary of Armstead's labor and that of Williams and Jacobs.

Under these undisputed material facts, we find on de novo review that the trial court did not err when it found that the Sheriff could not be held vicariously liable for the actions of Williams and Jacobs. *Skinner*, 149 So.3d 342; *Duplantis v. Dillard's Dep't Store*, 02-852 (La.App. 1 Cir. 5/9/03), 849 So.2d 675, *writ denied*, 03-1620 (La. 10/10/03), 855 So.2d 350. *See also*, *Robinson v. Allstate Ins. Co.*, 53,940, p. 11 (La.App. 2 Cir. 5/26/21), 322 So.3d 381, 387, *writ denied*, 21-906 (La. 10/19/21), 326 So.3d 264 (stating that "[n]o such actions of gross negligence could be asserted [against the Sheriff] in the petition because those defendants were not present when the accident happened, and they had no duty to observe an employee of the Village or the inmate's work that he was performing for it.").

## CONCLUSION

The burden of proof in summary judgment proceedings is set forth in La.Code Civ.P. art. 966(D)(1) that states:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse part"'s claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

If the non-moving party fails to do so, as in this case, there is no genuine issue of material fact, and summary judgment should be granted. La.Code Civ.P. arts. 966

and 967; *Williams v. Shoney's, Inc.*, 99-0607 (La.App. 1 Cir. 3/31/00), 764 So.2d 1021.

Pursuant to our de novo review of the pleadings and depositions, together with the affidavits submitted in support of the motion for summary judgment, we find that the Defendants satisfied their initial burden of showing the absence of support for one or more essential elements to the Plaintiffs' claim, and the Plaintiffs have failed to offer sufficient factual support to indicate that they would be able to meet their evidentiary burden of proof at trial. Accordingly, we find no error in the trial court's grant of motion for summary judgment in favor of the Defendants and further find it unnecessary to reach the Plaintiffs' additional argument that Armstead was in the process of escaping when he murdered Ms. Kite.

## DISPOSITION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the Plaintiffs.

**AFFIRMED.**